UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK

_____

KATHERINE E. KOTKOWICZ,

                          Plaintiff                          DECISION AND ORDER

-vs-

                                                          13-CV-6472 CJS

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                          Defendant.

_____

APPEARANCES

For the Plaintiff:              Ida M. Comerford, Esq.
                                   Jaya Ann Shurtliff, Esq.
                                   Law Offices of Kenneth Hiller, PPLC
                                   6000 North Bailey Avenue, Suite 1A
                                   Amherst, New York 14226

For the Defendant:           Emily M. Fishman, Esq.
                                   Social Security Administration
                                   Office of General Counsel
                                   26 Federal Plaza, Room 3904
                                   New York, New York 10278

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Katherine Kotkowicz ("Plaintiff") for Social Security

Supplemental Security Income ("SSI") disability benefits.  Now before the Court is

Defendant's motion (Docket No. [#9]) for judgment on the pleadings and Plaintiff's

cross-motion [#13] for judgment on the pleadings.  Defendant's application is granted

and Plaintiff's cross-motion is denied.

1

## PROCEDURAL HISTORY

Plaintiff claims to be disabled due to limitations imposed by several conditions, including multiple sclerosis ("MS"), depression and headaches.  Plaintiff contends that she became unable to work in 2007.  On November 4, 2010, Plaintiff filed the subject application for benefits.  The Commissioner denied that application, and on April 4, 2012, Administrative Law Judge Yvette Diamond ("the ALJ") conducted a hearing, at which Plaintiff appeared, with her attorney, and testified.  On May 8, 2012, the ALJ issued a Decision (82-91)[1] finding that Plaintiff was not disabled at any time between November 4, 2010, the date she applied for SSI benefits, and the date of the decision.

On September 5, 2013, Plaintiff commenced this action.  As will be discussed further below, Plaintiff maintains that the ALJ's finding, as to her residual functional capacity ("RFC") to perform work, was erroneous in two respects.  First, Plaintiff contends that the ALJ failed to give the proper amount of weight to the opinion of a mental health counselor.  Second, Plaintiff maintains that the ALJ's finding as to her credibility was not supported by substantial evidence.  Plaintiff maintains that the ALJ's faulty RFC determination resulted in an improper finding that she could still perform work on a sustained basis.

## VOCATIONAL HISTORY

At the time of the hearing, Plaintiff had completed high school and had earned an associate's degree.  Additionally, shortly before the hearing, Plaintiff applied to take additional college classes. (794)   Plaintiff previously worked as a retail cashier, food

---

[1]Citations are to the Administrative Record unless otherwise indicated.

service worker, bartender, short-order cook and home health aide. (45-49)

## ACTIVITIES OF DAILY LIVING

Plaintiff is able to care for herself and her elderly father, with whom she lives. (54)  Plaintiff performs household chores for herself and her father, such as cooking and cleaning. (54-55, 58-59)  Plaintiff also occasionally takes care of the lawn and garden. (55-56)  Plaintiff also watches television, goes to "chemical dependency classes," and, occasionally, visits family or friends and attends religious services. (56-57)

## MEDICAL EVIDENCE

Plaintiff's medical history was accurately summarized in the parties' submissions and need not be repeated here in its entirety.  As noted earlier, Plaintiff suffers from a number of conditions, including MS, depression and history of drug and alcohol abuse. The Court has reviewed the entire medical record, which indicates that Plaintiff's depression was generally well controlled with medication, including Cymbalta.  Plaintiff's medical providers and counselors frequently conducted mental status examinations, which were often unremarkable.  For example, in 2010 staff at Unity Health System conducted several mental status examinations that were essentially normal.  On April 28, 2010, Nurse Practitioner Sharon Zimmerman ("Zimmerman") conducted a mental status exam, and reported that Plaintiff's mood was neutral, her affect was appropriate and her concentration was fair. (268)    On June 30, 2010, Nurse Practitioner Lisa Dennison ("Dennison") conducted a mental status exam which was essentially normal, though she indicated that Plaintiff's concentration was only "fair." (270)  However, on September 29, 2010, Dennison reported that Plaintiff's mental status was generally

fine, and that Plaintiff's concentration was "good." (272-273)  On November 11, 2010, Kelly Collins, Ms.Ed. NCC ("Collins") reported that Plaintiff's mental status was normal, apart from the fact that Plaintiff seemed anxious and depressed. (261)  Collins specifically indicated that Plaintiff had no apparent cognitive deficits. *Id*.

Between June 2011 and February 2012, psychiatrist Kevin McIntyre, M.D. ("McIntyre") conducted three mental status examinations, each with similar results.  On February 9, 2012, McIntyre reported that Plaintiff's behavior was appropriate, her speech was normal, her thought form was logical and coherent, her thought process was unremarkable, her mood was euthymic, her affect was normal and her insight and judgment were both good. (743-744)  Significantly, McIntyre found that Plaintiff had "no apparent deficit" in her cognitive abilities. (744)  On November 11, 2011, McIntyre reported similar findings, though he indicated that Plaintiff's affect was "constricted," and her mood was only "fair." (747)  Again, though, he found no cognitive deficits. *Id*. On September 9, 2011, McIntyre reported almost identical findings, except that Plaintiff's mood was "variable" and her affect was "constricted," although she did not seem "overly depressed." (755)

During the same period that Plaintiff was being treated by McIntyre, her mental health counselor, Marsha Reed, M.S., CMHC ("Reed"),[2] also conducted a number of mental status exams, with findings that were generally less-favorable than McIntyre's findings. (707-738)  For example, Reed often indicated that Plaintiff seemed "distractible," although she also found, on at least two occasions, that Plaintiff's

---

[2]As a counselor, Reed is  a non-medical "other source" of evidence. See, 20 C.F.R. § 404.1513(d).

cognitive abilities were fine. (723, 738)  Reed also reported that Plaintiff seemed depressed at times and exhibited feelings of helplessness and worthlessness. However, it appears that Plaintiff's depressed moods during her sessions with Reed were often associated with ongoing domestic disputes that she had been having with her boyfriend over a period of years. *See, e.g.*, 706 (counseling session focuses on relationship with boyfriend); 710 (same); 718-719 (discussing sadness over boyfriend's substance abuse and lack of commitment); 722-723 (Plaintiff was initially crying about boyfriend, but then reported being happier after realizing that she could have more control in the relationship; 727 (Plaintiff was crying and expressed feeling helpless, in connection with boyfriend's "accusations")  Moreover, Plaintiff was continuing to abuse alcohol during this same period, which was causing problems in her life. *See, e.g.*, 714 (Plaintiff reported having been beaten up while drunk, and also having been arrested for committing a crime while drunk, while still on probation from another alcohol-related crime, and expressed need to stop drinking)

On March 26, 2012, Reed completed a "Mental Residual Functional Capacity Questionnaire." (802-806)  Reed's diagnosis was "major depressive disorder, [rule out] dysthymia," though she reported that Plaintiff had a "good response to Cymbalta for depressive [symptoms]." (802)  Reed summarized her clinical findings by indicatng that Plaintiff had poor concentration, was distractible, had superficial insight and fair judgment. (802)  Reed indicated that with respect to performing "unskilled work," Plaintiff would be "seriously limited"[3] with regard to working near others without being

---

[3]Reed used that term to mean "ability to function in this area is seriously limited and would frequently be less than satisfactory in any work setting." (804)

distracted, making simple work-related decision and dealing with work stress. (804)
However, Reed included a disclaimer to her opinion. (804)  Specifically, Reed stated
that since Plaintiff had not worked in years, and since Reed had never observed
Plaintiff while she was working, she could not say that her observations of Plaintiff could
be "directly interpreted regarding work ability." (804)

As for Plaintiff's MS, she received ongoing treatment from neurologist Louis H.
Medved, M.D.  ("Medved").  Medved's office notes indicate that Plaintiff's MS was
generally well-controlled with medication. *See, e.g., 293* ("[S]he is doing quite well");
295 ("[I]n general she is stable . . .  she is stable on Copaxone"); 305 ("Ms. Kotkowicz
states she is doing well.")  In addition to providing Plaintiff with medication to suppress
her MS symptoms, Medved also prescribed medication, to counteract Plaintiff's fatigue,
which was effective. *See, e.g.* 305 ("Provigil apparently helps her fatigue."); 296
(Indicating that Plaintiff should keep taking Provigil for fatigue, and should exercise and
lose weight); 303 (same)

On February 11, 2011, consultative examining neurologist Harbinder Toor, M.D.
("Toor") conducted an examination.  Toor reported that Plaintiff's gait was normal, but
that she had difficulty balancing while walking heel-to-toe. (424)  Toor indicated that
Plaintiff's mental status was essentially normal. *Id*.  Toor's conclusion was:

> Sometimes, she has balancing problems, mild, because of MS.  No other
> medical limitations suggested by today's evaluation.  She can be
> evaluated by a psychologist or psychiatrist.  [Apparently, Toor made this
> observation because Plaintiff had told Toor that she had a history of
> depression. (423).  However, Toor did not actually observe any signs of
> depression.]  Sometimes, on-and-off pain in the right knee with numbness
> interferes with her routine of walking, standing or squatting.

(425)

On February 11, 2011, consultative psychologist Christine Jean-Jacques, Ph.D. ("Jean-Jacques") examined Plaintiff. (427-432)  Plaintiff told Jean-Jacques that she left her last job, in or about 2007, "as a result of optic neuritis,[4] depression and drinking heavily." (427)[5]  Plaintiff indicated that she had twice attempted suicide, in 2000 and in 2008. (427)  Plaintiff stated that she often felt happy one week and unhappy the next, and experienced anxiety and difficulty sleeping at times. (428)  Plaintiff also claimed to be forgetful. (428)  Jean Jacques asked Plaintiff if an inability to concentrate affected her, and Plaintiff responded "that it does not affect her because she does not do anything." (428)   Plaintiff told Jean-Jacques that she was not using drugs or alcohol, although, as already noted above, Plaintiff subsequently admitted to Reed, in December, 2011, that she was still abusing alcohol. (714)[6]  Plaintiff told Jean-Jacques that she spent her days watching television (431), but also performed household chores and socialized with family. (430)  Jean-Jacques conducted a mental status examination and reported that: Plaintiff's gait, posture and motor behavior seemed normal, her thought processes were "coherent and goal directed," her affect was full, her mood was euthymic, her attention and concentration were intact, her short-term memory seemed

---

[4]The Court has not seen anything in the record to support Plaintiff's contention that her departure from her last job was related to an eye ailment or to any other medical condition.

[5]At the hearing, Plaintiff told the ALJ that she couldn't remember her last job, and when the ALJ asked why Plaintiff stopped working, she stated: "Fatigue, tiredness, developed – I'm really not sure.  I have a hard time remembering things." (45)

[6]On May 29, 2010, Plaintiff was admitted to the hospital after consuming alcohol and Vicodin pills. (418-420)  Plaintiff admitted to hospital staff that she sometimes took Vicodin when she was drinking, presumably to heighten the effect. (420) ("I do that when I'm drinking some time.")  However, at the hearing, Plaintiff  told the ALJ that she never took Vicodin. (53-54) ("I have no idea what you're talking about.  I was never taking Vicodin.")

somewhat impaired, her cognitive functioning was average and her insight and judgment were good. (430)  Jean-Jacques' opinion was as follows:

> The claimant appears able to follow and understand simple directions and instructions, perform simple tasks independently , maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress.
>
> Whereas *claimant reports* symptoms of bipolar 2 disorder, it is not clear if they are affecting her in her day-to-day life.  It is also not clear of [sic] she meets full diagnostic criteria for this disorder.

(431) (emphasis added)

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

he SSA has promulgated administrative regulations for determining when a claimant meets this definition.

The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(c)(2); 20 C.F.R. § 404.1527(c)(2).  However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling.   And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(c)(4), formerly designated as 20 C.F.R. § 404.1527(d)(4)).  Nevertheless,

[a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527[(c)](2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v)

> other factors brought to the Social Security Administration's attention that
> tend to support or contradict the opinion. *Id*. The regulations also specify
> that the Commissioner 'will always give good reasons in [her] notice of
> determination or decision for the weight [she] give[s] [claimant's] treating
> source's opinion.' *Id*.; *accord* 20 C.F.R. § 416.927[(c)](2); *see also Schaal*,
> 134 F.3d at 503-504 (stating that the Commissioner must provide a
> claimant with "good reasons" for the lack of weight attributed to a treating
> physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  However, an ALJ is not required

to explicitly discuss each factor, as long as his "reasoning and adherence to the

regulation are clear." *Atwater v. Astrue*, 512 Fed. Appx. 67, 70, 2013 WL 628072 at *2

(2d Cir. Feb. 21, 2013) ("Atwater challenges the ALJ's failure to review explicitly each

factor provided in 20 C.F.R. § 404.1527(c). We require no such slavish recitation of

each and every factor where the ALJ's reasoning and adherence to the regulation are

clear.") (citation omitted).

Administrative Law Judges are required to evaluate a claimant's credibility

concerning pain according to the factors set forth in the Commissioner's regulations,

which state, in relevant part:

> In determining whether you are disabled, we consider all your symptoms,
> including pain, and the extent to which your symptoms can reasonably be
> accepted as consistent with the objective medical evidence and other
> evidence. By objective medical evidence, we mean medical signs and
> laboratory findings as defined in § 404.1528 (b) and (c). By other
> evidence, we mean the kinds of evidence described in §§ 404.1512(b)(2)
> through (8) and 404.1513(b)(1), (4), and (5), and (d). These include
> statements or reports from you, your treating or nontreating source, and
> others about your medical history, diagnosis, prescribed treatment, daily
> activities, efforts to work, and any other evidence showing how your
> impairment(s) and any related symptoms affect your ability to work. We
> will consider all of your statements about your symptoms, such as pain,
> and any description you, your treating source or nontreating source, or

other persons may provide about how the symptoms affect your activities of daily living and your ability to work.

***

In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in

relevant part:

Factors relevant to your symptoms, such as pain, which we will consider include:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

However, while an ALJ is required to consider these factors, he is not required to

explicitly discuss each one. *See, Pellam v. Astrue*, 508 Fed.Appx. 87, 91, 2013 WL

309998 at *3 (2d Cir. Jan. 28, 2013) ("The ALJ did not apply an incorrect legal standard

when judging the credibility of Pellam's testimony. Although the ALJ did not explicitly

discuss all of the relevant factors, Pellam has failed to point to any authority requiring

him to do so. In any event, the ALJ cited the applicable regulation, 20 C.F.R. §

404.1529, explicitly mentioned some of the regulatory factors (such as Pellam's limited

use of pain medication), and stated that he considered all of the evidence required by §

404.1529.").  If it appears that the ALJ considered the proper factors, her credibility

determination will be upheld if it is supported by substantial evidence in the record. *Id*.

THE ALJ'S DECISION

On May 8, 2012, the ALJ issued the decision that is the subject of this action.

(82-91).  At the first step of the five-step sequential analysis described above, the ALJ

found that Plaintiff had not engaged in substantial gainful employment since November

4, 2010. (84)  At the second step of the analysis, the ALJ found that Plaintiff had the

following severe impairments: "multiple sclerosis, optic neuritis, bipolar disorder and

polysubstance abuse." (84)  At step three of the five-step analysis, the ALJ found that

Plaintiff did not have an impairment or combination of impairments that met or equaled

a listed impairment. (84)

Prior to reaching step four of the analysis, the ALJ determined that Plaintiff had

the following RFC:

> Claimant has the residual functional capacity to perform sedentary work
> as defined in 20 CFR 416.967(a) except that the claimant is limited to
> lifting and carrying 20 pounds occasionally and 10 pounds frequently.
> She can stand or walk for 2 hours in an 8 hour workday and sit for 6 hours
> in an 8 hour workday.  She has unlimited ability to push and pull but can
> only occasionally climb ladders, stairs, and balance.  She can engage in
> frequent stooping, kneeling, crouching and crawling.  The claimant
> requires the option to sit or stand at will without leaving the workstation,
> and the option to elevate her legs 12 inches off the floor 50% of the time.

She is limited to simple routine tasks; occasional contact with supervisors,
coworkers and the public; and requires a low stress job, which is defined
as occasional decision-making and occasional changes in work setting.

(86)

At step four of the five-step analysis, the ALJ found that Plaintiff was unable to

perform any of her past relevant work. (89)  However, at step five of the analysis, the

ALJ found, based on testimony from a vocational expert, that with the RFC set forth

above Plaintiff could still perform other jobs in the national economy. (90)  Specifically,

the ALJ found that Plaintiff could perform three sedentary unskilled jobs: surveillance

system monitor, DOT 379.367-010, charge account clerk, DOT 205.367-014, and

addresser, DOT 209.587-010. *Id*.

## DISCUSSION

Plaintiff does not object to the ALJ's findings at steps one, two or three of the

sequential analysis.  Nor does she object to the ALJ's finding at step four, that she

could not perform her past relevant work.  However, Plaintiff contends that the ALJ's

RFC determination is erroneous, in two respects.  First, Plaintiff maintains that the ALJ

gave too little weight to the opinion of counselor Marsha Reed regarding Plaintiff's non-

exertional limitations.[7]  Second, Plaintiff contends that the ALJ erred in finding that

Plaintiff's description of her limitations was not entirely credible.  Plaintiff objects to the

finding at step five only insofar as it is based on the alleged improper RFC

determination.  Accordingly, the issue before the Court is whether the RFC

---

[7]Plaintiff does not raise any issue with the RFC determination insofar as it pertains to her
exertional limitations.

determination is supported by substantial evidence in the record as a whole or is based on an erroneous legal standard.

Plaintiff takes issue with only a narrow aspect of the RFC determination as to non-exertional limitations.  Plaintiff objects to the weight that the ALJ gave to Reed's opinion, and contends that the ALJ would have found that Plaintiff is disabled if the ALJ had given more weight to Reed's opinion. *See*, Pl. Memo of Law [#13-1] at p. 10 ("[I]f the therapist were given significant or great weight, it is likely that Plaintiff would have been found to be disabled.")  However, Plaintiff does not identify the particular aspects of Reed's opinion that should have been given more weight.  Surprisingly, Plaintiff maintains that, "The ALJ *essentially discounts the entire opinion* of Marsha Reed." Pl. Memo of Law [#13-1] at p. 12 (emphasis added).  In fact, though, the ALJ's RFC assessment is largely consistent with Reed's report.  While the ALJ purportedly gave "lesser weight" to Reed's opinion, the ALJ accounted for Reed's assessed limitations in working with others, dealing with stress, handling detailed instructions and planning independently.  As a result of these restrictions, the ALJ limited Plaintiff to simple routine tasks, and to only occasional contact with supervisors, coworkers and the public. She further restricted Plaintiff to a "low stress job" entailing only occasional decision-making, and only occasional changes in the work setting.

Nevertheless, Plaintiff maintains that the ALJ erred in failing to give greater weight to Reed's opinion.  Specifically, Plaintiff maintains that the ALJ erred when she observed: "Lesser weight was assigned to Ms. Reed's medical source statement *because, per her notes, the assessment was based on the claimant's subjective complaints and not objective clinical data*." (89) (emphasis added)  Apparently, the ALJ

14

was referring to page four of Reed's report, where she indicated that her observations were "per client self report of current functioning." (805)  The Court agrees that such statement, on its own, would be erroneous, since a treating source's opinion may take into account the claimants's own subjective complaints or report: "Medically acceptable clinical and laboratory diagnostic techniques include consideration of a patient's report of complaints, or history, as an essential diagnostic tool." *Burgess v. Astrue*, 537 F.3d 117, 128  (2d Cir. 2008) (*quoting Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003), internal quotation marks omitted).  In fact, it is "axiomatic that a treating psychiatrist must consider a patient's subjective complaints in order to diagnose a mental disorder." *Santana v. Astrue*, No. 12 Civ. 0815(BMC), 2013 WL 1232461 at *14 (E.D.N.Y. Mar. 26, 2013);  *see also*, *Clester v. Apfel*, 70 F.Supp.2d 985 (S.D. Iowa,1999) ("Quite frankly, the Court is unaware of what a psychiatrist is expected to do during a consultative examination, other than to review the patient's history, conduct a mental status examination and to report the results and recommendations regarding the patient's ability to function"); 20 C.F.R. § 404.1528(b) ("Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.")  On the other hand, a treating source's opinion is not considered well-supported if it is based entirely on the claimants's own subjective reports. *See, Baladi v. Barnhart*, 33 Fed.Appx. 562, 564, 2002 WL 507139 at *2 (2d Cir. Apr. 4, 2002) (A medical opinion based on "plaintiff's subjective complaints of pain and

unremarkable objective tests" is not considered to be well supported by medically acceptable clinical and laboratory diagnostic techniques).

In this case, it appears that Reed's opinions were properly based on her observations made during her mental status examinations, and not merely on Plaintiff's subjective complaints.  To the extent the ALJ suggested otherwise, it was error.  The Court further notes that Reed made that comment in connection with Plaintiff's ability to perform skilled and semi-skilled work, which is not at issue in this action. (805)

However, any error on this point was harmless for several reasons.  First, as already discussed it clearly appears that the ALJ  incorporated Reed's opinions, as expressed in her report, to a large extent in the RFC.[8]  As the result, the RFC limits Plaintiff to far less than the full range of sedentary work, based primarily on the non-exertional limitations identified by Reed.  Significantly, in that regard, in finding that Plaintiff was limited to simple work, the ALJ gave more weight to Reed's opinion than to Jean-Jacques' opinion.[9]  Consequently, although Plaintiff suggests that the ALJ "essentially discounted" Reed's entire opinion, the Court disagrees.

Second, as the ALJ correctly pointed out, Reed herself questioned the worth of her opinions with regard to determining Plaintiff's abilities in a work setting.  And finally, the ALJ's RFC determination is clearly supported by substantial evidence in the record, such as the opinions of McIntyre and Jean-Jacques.  Frankly, such opinions were more consistent with each other, and with the rest of the record, than Reed's opinions,

---

[8]To the extent that Plaintiff suggests that the ALJ failed to incorporate specific aspects of Reed's opinion, she has not identified them.

[9]*See*, Record (88) ("I accord little weight to Dr. Jean-Jacques' assessment that the claimant is capable of dealing with stress and performing complex tasks independently.")

although, again, Reed's report did, in fact, receive substantial weight.  For all of these reasons, the ALJ's comment regarding Plaintiff's subjective complaints does not require remand.

Plaintiff's second argument is that the ALJ's credibility determination is not supported by substantial evidence.  Plaintiff maintains that the ALJ "cherry picked" evidence to support a finding that Plaintiff is not disabled, while ignoring other substantial evidence.  For example, Plaintiff contends that the ALJ downplayed the extent of her MS symptoms, including her fatigue.  On this point, Plaintiff indicates that the ALJ incorrectly stated that her MS was stable, and that her fatigue was being controlled with medication.  Of course, an ALJ "cannot simply selectively choose evidence in the record that supports his conclusions." *Meadors v. Astrue*, 370 Fed.Appx. 179, 185, 2010 WL 1048824 at *4, n.2  (2d Cir. Mar. 23, 2010) (citation omitted)  In this case, however, the ALJ did not cherry-pick evidence as Plaintiff claims.  This is clearly not a situation where the ALJ had to pick through the record to find evidence to support a finding that Plaintiff is not disabled.  Instead, the record consistently indicates that Plaintiff's MS, including her fatigue, were well-controlled with medication.  Nor did the ALJ selectively highlight a few favorable mental status examinations.  To the contrary, as discussed above, the mental status examinations were generally unremarkable, particularly with regard to Plaintiff's cognitive abilities.  Nor does the Court agree that the ALJ otherwise failed to provide "good reasons" for her credibility determination.  Accordingly, Plaintiff's argument on this point also lacks merit.

17

CONCLUSION

Defendant's motion (Docket No. [#9]) for judgment on the pleadings is granted

and Plaintiff's cross-motion [#13] for judgment on the pleadings is denied.  The Clerk of

the Court is directed to close this action.

So Ordered.

Dated: Rochester, New York
         July 31, 2014                              ENTER:


                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge